The argument is $23-1375 Financial Group v. Brittex Financial. The argument is $23-1375 Financial Group v. Brittex Financial, Inc. I think I would like to start off with the standard for the Zone of Natural Expansion and how we believe DFG is misapplying it. The Zone of Natural Expansion and Trademark Lio typically is, and to my knowledge is, solely used to compare the goods sought or services sought by the applicant in the application and the goods and services of the opposer. The extension that DFG is suggesting to the Zone of Natural Expansion is, no, no, no, let's look at the goods that we applied for in these registrations and look at our own prior registration and those goods to get the data priority. That is not the relevant inquiry. The relevant inquiry is the goods applied for in the application compared to the goods of the opposer. The reason that there is this... I think I am not quite following. Pond Broking, Pond Services are one of the goods, services in the current application. Correct. You don't need to do a lot of comparison to ask if the opposer's services, Pond Broking, are within the Zone of Natural Expansion. No, no. What I am saying is they are using the Zone of Natural Expansion between their own loan financing and Pond Services to try to obtain priority back to 1984. That is not the relevant inquiry. It is not a comparison of their later registrations to their earlier. The reason for that is... What is the correct comparison? The correct comparison if the Zone of Natural Expansion were to apply here would be to compare the goods in their current registrations, their services, including Pond Services, to our Pond Services. They are the same. They are the same. That is why you say this circumstance can't involve the Zone of Natural Expansion test. That is correct. That is why I believe it is not applicable. The reason behind this is that if you allow a registrant to obtain a letter registration for unrelated goods and services based on their earlier registration, and they haven't built up a lot of goodwill in that new area, you are essentially granting that registrant trademark rights in gross with no goodwill. It ignores a situation that we have here where Brotex has over 30 years of common law use. You would essentially be cutting off the use by Brotex. In the trademark system in the United States, we base our trademark rights, common law, or registered based off use. Cutting off that intervening use is not really what the Zone of Natural Expansion was designed to do. That is why we don't believe that it applies. Do you think that what you just articulated is what is underlying the, what's the name of the case, Jack something? Jacks-Evans, yes. As a matter of fact, the board in Jacks-Evans mentioned that this problem of granting trademark rights in gross when a prior registrant seeks to enter a new area and there is an intervening user in between. What would happen in this case if Brotex did come in and try to actually register its mark rather than just rely on its common law mark and then DSG then used its prior payday lending mark registration to argue the Zone of Natural Expansion? That would be, that sounds more along the lines of what the proper use would be, is they're relying on their mark and saying the later filed registration is within the Zone of Natural Expansion. How, even though you have a prior common law mark, how do you think that would play out? Today, because we started in 1993, I think there's been coexistence for so long that I don't know that that Zone of Natural Expansion would outweigh the fact that we've coexisted for so long. So I think that there are certainly arguments that we could make to overcome the argument on the Zone of Natural Expansion, but it would be available for DSG to argue. And I think the other point that I wanted to bring... Sorry, trademark law, we don't see a lot of these, so I'm not as nimble. So even if legally it was available, there are still arguments to be had that you shouldn't use it in this instance. Even if you assume that payday lending would naturally extend into pawn services, there's still some basis for you to still get a registration, even if they could show a net. What's the legal basis for that? Well, I think that there are certain elements of the DuPont factors, and the main one coming to mind is the coexistence in the marketplace for so long. So no likelihood of confusion. That would be the basis. The other argument of DFG that Brotetz kind of finds a little bit troubling is this... Sorry, just to be clear, that kind of argument might be in some tension with the likelihood of confusion finding here. I didn't follow. You have and are defending the board's finding that if the other side got into this business with their mark, there would be a likelihood of confusion with you being in this business with that mark. Right. Well, in this case, the board granted the Section 18 defense of DFG, which means all that was canceled out of those registrations was the PON services. When that happened, I think the reality is the likelihood of confusion analysis is PON services to PON services. Okay. Using the doctrine to relate back in this scenario that Brotetz files for a registration and DFG argues that the zone of natural expansion with regard to their loan financing, that's where the defense that we, the arguments that we may have on likelihood of confusion and coexisting in the marketplace with regard to their loan financing versus our PON services comes in. The other argument of DFGs that we find somewhat troubling is this philosophical argument that the Lanham Act encourages registration and favors registration over common law. From a practical standpoint, the argument is troubling in that, again, we base trademark rights whether registered or not based on use. Okay. And in order for DFG to prevail in that argument, the effect of that essentially is that it would grant trademark rights based on registration and cut off rights based on use, based on our use. And that's not really what the trademark system was designed to do. We're not going to decide that here in the context of this case, right? I mean, we don't do policy. No, I don't believe we do. I just, I thought it was worth pointing out as a philosophical matter. It's scary, I guess, is the point that I'm making here. So, that's really the arguments I had for today. Are there any other questions that you have? There's not. Okay. Thank you. Any further questions? Your Honor, we would just respectfully disagree with Mr. McRae's explanation of the Zone of Natural Expansion test. I think, as the board pointed out, as the court pointed out, it doesn't really make any sense to compare the services in the registrant's registration to the services in the opposer's registration. That's the purpose of the likely confusion test, not the Zone of Natural Expansion test. The whole purpose of the Zone of Natural Expansion test is to allow an applicant or registrant to rely upon its prior registration or its prior common law use over an intervening user when those services, when the original services, excuse me, when the later services are within the Zone of Natural Expansion of the original services. And that's based on the principle that the first use, I'm going to quote from the Mason Engineering Test, the principle that the first use of a mark in connection with particular goods or services possesses superior rights in the mark, not only in connection with those goods or services, but also against subsequent users of the same or similar mark for any goods or services which purchasers might reasonably expect to emanate from it in the normal expansion of its business under the mark. And that's the rationale underlying the Zone of Natural Expansion test. And it's also the rationale underlying this court's recent opinion in the Apple versus Bertini case, which was decided after the board's decision in this case. In the Apple versus Bertini case, the court said that the owner of a mark could apply tacking to tack on its earlier mark in early registration in connection with services that might be slightly different from those in the later application of registration when those services are within the normal course of evolution of the original services, such that consumers would expect them to emanate from the same source. So that's quite similar. I don't think we said that that is a sufficient condition, only that it sometimes is a circumstance in which tacking would be permitted. Yeah, that's true, Your Honor, but we believe this is one of those cases where it should be permitted. And Apple lost that case. Apple did lose that case, but I think the jump from trying to jump from goods to services, from jazz records to musical services, and that's quite a bit different than our case where we're jumping from one type of financial services offered to a specific type of consumer to another type of services offered to that type of consumer. I'd just like to point out one final matter in connection with the question you asked earlier about expanding from A to B or B to A. The portion you cited of our appellate brief was just kind of a summary of our evidence. We do have a lot more evidence that was not cited in there, some of which shows, I would agree that the majority shows pawn services expanding to check-cashing and payday loan. We do have some examples also of payday loan stores expanding into pawn services, and I think that's another reason why this Court needs to remand to the Board for a full consideration of the factual record. So thank you very much, Your Honor.